# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Shawna D. E.,

        Plaintiff,

v.

Frank Bisignano, Commissioner of Social
Security,

        Defendant.

Case No. 25-cv-2815 (SRN/DTS)

**ORDER**

James H. Greeman, Greeman Toomey, 250 Second Ave. S., Ste. 120, Minneapolis, MN 55401, for Plaintiff

James D. Sides, Social Security Administration, 6401 Security Blvd., Baltimore, MD 21235, for Defendant.

Pursuant to 42 U.S.C. § 405(g), Plaintiff Shawna D.E. seeks judicial review of a final decision by the Defendant Commissioner of Social Security (the "Commissioner") denying her applications for supplemental security income ("SSI"). The matter is before the Court on Plaintiff's Brief [Doc. No. 10].[1]

Plaintiff seeks reversal of the Commissioner's decision on remand to the Social Security Administration, arguing that the Administrative Law Judge (ALJ) failed to identify all of her severe impairments, and that his determination of her residual functional capacity (RFC) failed to include all her limitations. (Pl.'s Br. at 28–34.) In addition,

---

[1] As of December 1, 2022, Social Security actions under 42 U.S.C. § 405(g) are "presented for decision on the parties' briefs," rather than summary judgment motions. Supp. R. Soc. Sec. 5.

Plaintiff argues that the ALJ failed to address her ability to complete a probationary period of employment. (*Id.* at 34–36.)

For the reasons set forth below, the Court finds that the ALJ's decision is supported by substantial evidence and denies Plaintiff's request for relief.

## I.    Background

### A. Procedural History

Plaintiff, who is currently 35 years old, first applied for SSI on November 17, 2020, alleging disability beginning on October 1, 1997, when she was seven years old. (*See* Soc. Sec. Admin. R. (hereinafter "R.") 282, 870.)[2]  Plaintiff's alleged severe impairments include chronic gastritis with bleeding, chronic diarrhea, low body mass indexes, postural orthostatic tachycardia syndrome (POTS), migraine headaches, scoliosis, depression with anxiety/depressive disorder with anxious distress, panic disorder without agoraphobia, and attention deficit hyperactivity disorder (ADHD). (R. 18.)  Her medical record also includes the following impairments:  asthma, shoulder spasticity, endometriosis, and bunions. (R. 18–19.)

Plaintiff has not engaged in substantial gainful activity since her application date of November 17, 2020. (R. 17,  874.)

---

[2] The Social Security administrative record is filed at Doc. No. 7 (index & pp. 1–1125), Doc. No. 7-1 (pp. 1126–1999), and Doc. No. 7-2 (pp. 2000–2046). The record is consecutively paginated, and the Court cites to that pagination rather than docket number and page.

After Plaintiff's initial SSI application was denied, as well as her request for reconsideration, she requested a hearing before an ALJ. (R. 132–35, 139–41, 144.) ALJ Corey Ayling held hearings on April 25, 2022 and June 24, 2022. On August 30, 2022, the ALJ found that Plaintiff was not disabled, and denied her application for disability benefits. (R. 32.) Plaintiff's request for review before the Appeals Council was denied. (R. 1–6.)

Plaintiff then filed a Complaint in this Court, 23-cv-0210 (JWB/DLM), seeking further review. The Court found that the ALJ had erred because Plaintiff's RFC was not supported by substantial evidence—namely, the ALJ had made no reviewable finding on the off-task time and absenteeism limitations resulting from Plaintiff's headaches/migraines and gastritis/chronic diarrhea. (No. 23-cv-0210 (JWB/DLM) R&R [Doc. No. 16], (R. 1074–91), *adopted by* Jan. 22, 2024 Order [Doc. No. 17].) Accordingly, the Court remanded the matter to the Social Security Commissioner for further proceedings, directing the ALJ to reevaluate the evidence on how often and for how long Plaintiff's headaches/migraines and gastritis/chronic diarrhea would cause her to be off-task during and/or absent from work. (R&R at 17; Jan. 22, 2024 Order at 1.)

On remand, ALJ Ayling held hearings on September 25, 2024, and February 28, 2025. (R. 903–1020.) After the last hearing, additional medical records were submitted, as well as a letter and work questionnaire from Plaintiff's vocational counselor. (*Id.*) The ALJ issued a decision on April 15, 2025, again finding Plaintiff not disabled. (R. 867–92.)

Plaintiff filed the instant Complaint on July 10, 2025, requesting that the Court reverse the ALJ's decision and order the award of benefits, or in the alternative, remand the matter for further proceedings. (Compl. [Doc. No. 1] ¶ 8; Pl.'s Br. at 36.)

In response, Defendant contends that substantial evidence supports the ALJ's decision and therefore requests that the ALJ's finding of no disability be affirmed. (Def.'s Br. [Doc. No. 18] at 1, 15.)

### B. Relevant Medical and Other Evidence

Plaintiff lives in the vicinity of Grand Rapids, Minnesota. (*See* R. 115, 1168.) She was abused as a child and struggles in relationships. (R. 1809). After living in a group home between the ages of 12 and 18, she graduated from Deer River High School in 2009, and transitioned into adult foster care at age 19. (*Id.*) Plaintiff has one child, who is approximately 12 years old, with whom she lives and maintains sole custody. (R. 914.)

Prior to the alleged onset of disability, Plaintiff worked as a nursing assistant, cook, and gas station worker for short stretches of time. (R. 30, 112, 303, 318.) At the time of her most recent SSI application, Plaintiff worked as a museum assistant with the Itasca Historical Society, four hours a day, four days a week. (R. 911.)

As for her living arrangements, the record shows that Plaintiff lived with a boyfriend in 2021 and 2022 (R. 309, 1991), with her mother and son in 2021 and 2022, (R. 659, 1100, 1389), with her significant other and son in 2023 (R. 1465), and in a rented home with her son in 2024. (R. 914, 981.)

### 1. Migraines and Headaches

On August 5, 2018, Plaintiff presented to the emergency room in Bigfork, Minnesota, with complaints of a migraine with aura, photophobia, phonophobia, nausea, and vomiting. (R. 415–16.) Medical staff treated her with intravenous medications. (*Id.*) She returned on September 20, 2018, complaining of nausea. (R. 467.)

In March 2020, Plaintiff visited the emergency room in Grand Rapids, Minnesota, for evaluation of a headache and loss of consciousness. (R. 563.) She reported a history of migraine headaches that had diminished after she experienced a traumatic brain injury while riding a snowmobile. (*Id.*) In their place, Plaintiff experienced tension headaches. (*Id.*) She reported that her current headache had been present for a month. (*Id.*) She received pain medication that reduced her pain to an acceptable level. (R. 566–67.)

During a clinic visit on September 3, 2020, Plaintiff reported episodes of spacing out, and days-long migraines occurring two to three times per month, with symptoms including kaleidoscope vision, tunnel vision and eventual total loss of vision. (R. 599.) She identified smells, lights, and sounds as triggers. (*Id.*)

At a September 14, 2020 visit to Bemidji Neurology, Plaintiff was evaluated for postural dizziness with pre-syncope, headaches, migraines, and follow-up for POTS. (R. 494–95.) She reported syncopal issues that occurred daily, requiring her to lay down for 15 to 20 minutes or risk losing consciousness, and reported headaches for 18 days per month. (*Id.*) Notes from her general physical examination show that Plaintiff appeared frail and extremely thin. (R. 498.) She was advised to begin daily prophylactic therapy with Florine and Midodrine, with plans for up-titration. (R. 494, 510.)

On November 9, 2021, Plaintiff visited the emergency room with back and neck pain, headache, lightheadedness, and nausea. (R. 776.) She was seen again on December 7, 2021, reporting severe neck pain and difficulty holding up her arms. (R. 762.) Plaintiff also stated that she had recently experienced tunnel vision and neck pain that precipitated migraines. (*Id.*) She reported that none of the following medications improved her relief from headaches: triptan, gabapentin, baclofen, Norco, methocarbamol, and oxycodone. (R. 767.)

At a December 10, 2021 follow-up visit in the clinic, Plaintiff was diagnosed with acute, intractable tension-type headaches that could trigger migraines, as well as migraine with aura and without status migrainosus, not intractable. (R. 759.) She received a lidocaine injection and started taking Depakote. (R. 758–59.)

At the April 25, 2022 hearing, Plaintiff testified about her issues with migraines and described sharp pains in the side of her head, vision loss or distortion, and nausea or vomiting. (R. 64.) She reported that headaches were a daily problem, with migraine headaches lasting between two hours to two days. (R. 71.)

Plaintiff visited the emergency room on November 2, 2023, complaining of chest pain, headache, and lightheadedness. (R. 1686.) Her symptoms were found to be related to her POTS diagnosis. (*Id.*)

In a September 10, 2024 neuropsychological screening report, Plaintiff described migraines, random headaches, and neck pain as "ongoing," but denied taking any medication for pain or headaches. (R. 1812.)

6

At the September 25, 2024 hearing before the ALJ, Plaintiff again testified about her ongoing migraines. (R. 991–92.) She stated that she experienced the symptoms of migraines on a daily basis, although the timing of her most severe migraines was unpredictable. (*Id.*) She testified that when her headaches are most pronounced, approximately twice a month, she loses her vision or vomits, and is sensitive to light, smells, and noise. (*Id.*) She also reported that viewing a computer screen can trigger headaches. (R. 975.) While she had taken medications for migraines in the past, she found them ineffective. (R. 1001.) At the time of the September 2024 hearing before the ALJ, Plaintiff was not taking medications for migraines. (*Id.*)

### 2. Chronic Gastritis and Diarrhea

On September 25, 2021, Plaintiff presented to the emergency room, suffering from abdominal pain and vomiting. (R. 718, 726.) Medical records indicate that the cause was believed to be gastritis or peptic ulcer disease. (*Id.*) Plaintiff denied that she was experiencing diarrhea at that time. (R. 718.)

At an October 15, 2021 follow-up visit, Plaintiff presented with complaints of anxiety and chronic diarrhea. (R. 784–85.) Progress notes list omeprazole and sucralfate as medications Plaintiff had previously taken for gastritis, and as to her chronic diarrhea, the notes state, "She can look into meat allergy as well as alpha gal allergy." (R. 785.)

At a medication management appointment in August 2023, Plaintiff reported occasional nausea, diarrhea, constipation, and vomiting. (R. 1444.)

On January 26, 2024, Plaintiff visited the emergency room, primarily for chest pain and extremity weakness, but also fatigue, low appetite, and "some diarrhea" in the previous four days.  (R. 1673–74.)

At the September 25, 2024 hearing, Plaintiff testified that, in the past, a prescription medication had been ineffective in treating her gastrointestinal issues, including diarrhea, and she was not taking any prescription or over-the-counter medications for diarrhea at the time of the hearing.  (R. 1001.)

### 3.  Other Medical Impairments

The medical record also contains diagnoses of and treatment for POTS (R. 73, 494–95, 678, 995, 1006, 1017, 1681, 1686), anxiety and panic attacks (R. 662, 742, 785, 1398, 1414, 1494, 1519, 1553–54, 1809, 1892, 2016, 2031), depression (R. 662, 700, 1407, 1414), low BMI (R. 678, 759, 1448, 1672, 1893), bunions (R. 675), and scoliosis (R. 523, 680).

In addition, the records refer to treatment for neck pain (R. 586, 593, 762, 776), cervical radiculopathy and acute trauma injury to the cervical spine (R. 727–36, 737–41, 748), chronic thoracic back pain, thoracic myofascial strain, and lumbar back pain (R. 523, 763, 767, 804, 809, 830, 835), and insomnia (R. 658, 742, 747).  Plaintiff also testified to having fetal alcohol syndrome and a head injury from a snowmobile accident.  (R. 926.)

### C.    Hearing Testimony

There are four hearing transcripts in the record.  (R. 903–60, 961–1020, 1092–1108, 1109–50.)  As noted earlier, on remand, the ALJ held two hearings, occurring on

8

September 25, 2024, and February 28, 2025.  Prior to the decision on remand, the ALJ held two hearings on April 25, 2022 and June 24, 2022.

### 1. Plaintiff

Plaintiff testified that she is scheduled to work approximately 16 hours every week at the Itasca County Historical Society, in increments of four four-hour shifts, although she regularly misses some of her scheduled work time.  (R. 915, 973.)  At the February 28, 2025 hearing, Plaintiff testified that she reports absent for work "because I'm usually not feeling good enough to get up to go to work or even get going for the day."  (R. 915.)

Her job duties include answering visitors' questions, ringing up customers' purchases, preparing for fundraisers, and uploading old newspaper articles online, although she testified to her inability to view a computer screen for more than 15 minutes due to her migraines.  (R. 975.)  She tries to work in four or five-hour shifts.  (R. 976.)  Plaintiff obtained her museum assistant position through a job training service, and testified that "it took us quite a while to find something that my body could handle for a short period of time."  (R. 982.)  She is able to alternate between sitting and standing on the job.[3]  (*Id.*)

Plaintiff testified that she uses the bathroom, on average, approximately every four hours to defecate.  (R. 917.)  When she has a bowel movement, she may spend 20 to 30

---

[3]  Jennifer Frimanslund, Plaintiff's career counselor at the Northeast Minnesota Office of Job Training, submitted a post-hearing work activity questionnaire, in collaboration with Plaintiff's supervisor at the Itasca County Historical Society.  (R. 1373–74.)  Ms. Frimanslund indicated that Plaintiff requires additional assistance at her job, is assigned fewer or easier duties, has a special relationship with her employer, and is accommodated with additional or longer breaks, fewer work hours, extra time to complete tasks, and tolerance for absenteeism.  (R. 1374.)

minutes in the bathroom.  (R. 977–78, 989.)  Plaintiff testified that this was her experience for several years.  (R. 989.)  When she feels the need to access the bathroom, it is urgent, and she testified to having experienced bowel incontinence when she was unable to reach a bathroom.  (R. 988.)  She testified that in a seven-day period, she has problems with diarrhea two or three days.  (R. 916.)

As to her BMI, Plaintiff noted that she has always had a low BMI as an adult, stating, "I was a normal size as a baby, but as I got older, I got tall and skinny, and now that I'm older, I'm just super skinny."  (R. 1116.)  At the September 25, 2024 hearing, she testified, "If I eat, then that's when I have to go to the bathroom, so half the time, I just don't eat." (R. 978–79.)  As to medications, Plaintiff denied taking any prescription or over-the-counter medication for diarrhea.  (R. 1001.)

She testified that her low weight is related to some of her mental health problems. (R. 919.)  If she is depressed, she feels weak, lacks energy, and finds it difficult to get something to eat.  (R. 920.)

Plaintiff testified that almost all of her prior employment positions ended because the positions "were too fast paced" and she "couldn't stand for long periods of time."  (R. 984–85; *see also* R. 925–26.)  She stated that she was terminated from one of her prior positions because she visited the bathroom too frequently.  (R. 984–85.)  Plaintiff testified about workplace absenteeism due to her physical and/or mental conditions.  (R. 986.)  She estimated that she was absent for approximately half of her scheduled shifts.  (R. 923, 987.) Plaintiff testified that her current employer does not react negatively, but her job counselor confronts her about her absenteeism.  (R. 923.)

10

Plaintiff also testified that some of her job absences have been attributable to migraines.  (R. 990.)

### 2.  Dr. Kweli Amusa, M.D., Medical Expert

Based on her review of Plaintiff's records, Medical Expert Kweli Amusa, M.D., testified at the September 25, 2024 hearing about Plaintiff's physical impairments.  (R. 999–1018.)  Among Plaintiff's severe impairments, Dr. Amusa identified degenerative changes in Plaintiff's right foot.  (R. 1004.)  She also noted problems with Plaintiff's right elbow, although the records showed the issue was intermittent over the course of several years, (R. 1005–06), POTS or having tachycardia when in an upright position (R. 1006), scoliosis in the thoracic lumbar area of the spine (R. 1007), and neck muscle pain.  (*Id.*) As to headaches, Dr. Amusa testified, "I'm not seeing the frequency established, the severity established in the evidence so it would be somewhat difficult for me to give you limitations in reference to that condition."  (*Id.*)  Finally, among the severe impairments, Dr. Amusa addressed Plaintiff's weight, but found no significant changes in her weight, and no indication that her weight was subject to active medical treatment.  (*Id.*)

She testified that Plaintiff should be subject to the following workplace limitations: lifting restrictions of no greater than 20 pounds on occasion or ten pounds frequently; standing or walking no longer than four hours in an eight-hour day; sitting for six hours a day; no ladders, ropes, or scaffolding; occasional overhead reaching bilaterally, with all other reaching limited to frequent; occasional pushing or pulling; no unprotected heights or hazards; avoidance of respiratory irritants due to Plaintiff's history of asthma; no

extreme heat, cold, vibration, or uneven terrain; and no light, noise, or odor exposure during headaches.  (R. 1010–11.)

### 3.  Kevin Yi, Vocational Expert

Vocational Expert Kevin Yi testified at the February 28, 2025 hearing before the ALJ.  (R. 937.)

The ALJ first found that Plaintiff had no prior relevant work, then posed the following hypothetical question to Mr. Yi:

> First, I want you to assume an individual of the Claimant's age, education, and past work.  Assume this individual is limited to light work.  However, unlike the DOT's definition of light, I'm going to find a limit of four hours in an eight-hour shift where the Claimant could be on her feet; going to find occasional foot controls with the right and left.  Manipulative limitations, occasional overhead reaching with the left and right; for all other reaching laterally, frequent with the left and right, so frequent reaching except for occasional overhead.  Postural limitations, occasional climbing of ramps and stairs; no climbing of ladders, ropes, or scaffolds; occasional balancing as that term is defined in the SCO; occasional stooping, occasional kneeling, occasional crouching, and occasional crawling.  Environmental limitations, no work at unprotected heights; no work near moving mechanical parts, the kind of moving machinery such that a loss of balance in proximity [to] that machinery would pose a severe safety hazard to life or limb.  Regarding dust, odors, fumes, and pulmonary irritants, can breathe without restriction but no work requiring direct exposure to concentrated sources of pulmonary irritants; no exposure to extremes of cold or heat.
>
> Now, turning to mental health issues, can understand, carry out, and remember simple instructions; can adapt to and manage occasional changes in a routine work setting. . . .  Pace limitation as follows:  able to perform simple, routine, and repetitive work but no assembly-line work or other work similarly requiring a specific production-rate pace.  Interactions with supervisors, coworkers, and the general public, can respond appropriately to supervision, coworkers, and usual work situations involving occasional but superficial contacts with others. . . . Superficial contacts are those involved simply exchanging information or taking directions without any complex teamwork or other social interaction . . . .  Well, based on all that, would there

be any light or sedentary jobs in the economy that such an individual could perform?

(R. 939–41.)  Mr. Yi testified that such a person could not perform any light exertion work, but could perform certain sedentary, unskilled jobs as a final assembler, lab tester, and electronics inspector.  (R. 941.)

When the ALJ asked Mr. Yi to consider an array of physical and mental impairments that might affect attendance and off-task behavior, Mr. Yi testified that employer tolerance for absenteeism was "no more than two days per month."  (R. 944.)  As to off-task behavior, Mr. Yi opined that employer tolerance was for no more than 10% of work time.  (*Id.*)

Plaintiff's counsel then asked Mr. Yi about employer tolerance for extra breaks in the workday, other than two 15-minute breaks and one 30-minute lunch break.  (R. 945.) Mr. Yi opined that if the request for additional breaks lasted more than two weeks, "there would be no competitive employment."  (*Id.*)  If an employee requested one extra break, on a weekly basis, for 10 to 30 minutes to use the bathroom, Mr. Yi testified such a requirement would preclude competitive employment.  (R. 946.)  Plaintiff's counsel further asked Mr. Yi about an employer's tolerance for absenteeism during the first 30 days of an employee's employment—a period that Mr. Yi characterized as a typical probationary period.  (*Id.*)  Mr. Yi responded that there is generally no such tolerance, but perhaps a one-time absence could be excused.  (R. 947.)

As  to whether an employee could request written instructions after the probationary period, Mr. Yi described that as an unusual request for any unskilled job.  (R. 948.)  He stated, "That might be tolerated during the probation period and for the on-the-job training

period.  It might be tolerated.  But after that, that would not be tolerated." (R. 949.)  Of the three jobs that Mr. Yi identified for Plaintiff, he testified that if an employee required written instructions to perform an unskilled job, such a request would be an accommodation on the part of the employer and would be inconsistent with competitive employment.  (R. 948–49.)

### 4.  Dr. Allen Heineman, Ph.D., Medical Expert

Dr. Heineman, a licensed clinical psychologist, testified at the April 15, 2022 hearing about Plaintiff's mental health conditions.  (R. 1101.)  Dr. Heineman noted his review of medical records from April and December 2021 that diagnosed Plaintiff with persistent depressive disorder, characterized as moderate in severity, with anxious distress, as well as ADHD, and panic disorder without agoraphobia.  (R. 1103.)  As to Plaintiff's depression and ADHD, Dr. Heineman opined that while the two conditions were severe, they did not meet the listing criteria for disability.  (R. 1104.)  He rated Plaintiff's mental functioning as "moderate" in the areas of "understand[ing], remember[ing], apply[ing] information, interact[ing] with others, concentrate[ing], persistence, pac[ing], adapt[ing], and manag[ing]." (*Id.*)  Dr. Heineman did not find records diagnosing Plaintiff with fetal alcohol syndrome at the time of his review, but Plaintiff testified that she has received that diagnosis since birth.  (R. 1104, 1106.)

### 5.  Dr. Subramaniam Krishnamurthi, M.D., Medical Expert

Dr. Subramaniam Krishnamurthi, M.D., whose practice focuses on internal medicine and cardiology, testified at the June 24, 2022 hearing.  (R. 1132.)  He noted that Plaintiff's medical records reflected severe physical health diagnoses of asthma, migraine

headaches, and POTS.  (R. 1134.)  When asked by the ALJ about whether Plaintiff's low weight was linked to her gastrointestinal impairments, Dr. Krishnamurthi testified that the record did not include a disorder that would cause Plaintiff's low BMI.  (*Id.*)  Dr. Krishnamurthi opined that Plaintiff did not have a medical condition that met or equaled any of the disability listings.  (*Id.*)

Upon examination by Plaintiff's counsel, Dr. Krishnamurthi testified that Plaintiff's migraine impairment did not meet a listing requirement because the records did not reflect a history of hospitalization for migraines, ER visits, doctor visits, or the prescription of different medications.  (R. 1135, 1137.)  With respect to POTS, Dr. Krishnamurthi explained that he did not find it met the listing criteria because in the records, Plaintiff "reported no additional symptoms, no syncope."  (R. 1136.)

### 6.  Gail Ryan, Vocational Expert

Vocational Expert Gail Ryan also testified at the June 24, 2022 hearing before the ALJ.  (R. 1139.)  In response to a hypothetical question posed by the ALJ, Ms. Ryan testified that there were light jobs in the national economy that Plaintiff could perform.  (R. 1143.)  Specifically, she identified jobs as a collator operator, routing clerk, and marker. (*Id.*)  When asked about employer tolerance for an employee being off-task due to migraines and the need for frequent bathroom breaks, Ms. Ryan testified that an employer would tolerate breaks for 10% or less of the time in an eight-hour workday.  (*Id.*)  She stated that a requirement for an unscheduled break of ten minutes every hour would be inconsistent with full-time, competitive work.  (*Id.*)  She also testified that breaks outside the typical 15-minute breaks, twice daily, and 30-minute meal break are generally not

15

tolerated and would require special permission from the supervisor or employer. (R. 1147.)

Ms. Ryan agreed that special permission would be equivalent to an accommodation. (*Id.*)

### D.   ALJ's Decision on Review

In the ALJ's April 15, 2025 decision, he conducted the five-step sequential analysis

outlined in 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4).[4]   At Step One, the ALJ

determined that Plaintiff had not engaged in substantial gainful activity since her

November 17, 2020 application date. (R. 874.)  At Step Two, the ALJ concluded that

Plaintiff has the following severe impairments:

> chronic gastritis and chronic diarrhea, and low body mass indexes (BMIs); postural orthostatic tachycardia syndrome (POTS); scoliosis of the cervical spine; migraine headaches; mild intermittent asthma; and mental conditions, variously diagnosed as depression with anxiety, depressive disorder with anxious distress, major depressive disorder, bipolar disorder, panic disorder with agoraphobia/without agoraphobia, attention deficit hyperactivity disorder, borderline intellectual functioning, neurodevelopmental disorder, fetal alcohol syndrome effects, posttraumatic stress disorder.

(*Id.*) (record citations omitted); *see* 20 C.F.R. § 416.920(c).  The ALJ concluded at Step

Three that Plaintiff did not have an impairment or combination of impairments that met or

---

[4] Steps One through Four ask: (1) whether the claimant has engaged in substantial gainful activity since the alleged onset of disability; (2) whether the claimant is suffering from a severe medical impairment; (3) whether claimant's impairment meets or equals the severity of an impairment listed in the Listing of Impairments (20 C.F.R. Part 404, Subpart P, App. 1); and (4) whether the claimant has the Residual Functional Capacity (RFC) to perform their past relevant work (PRW).  20 C.F.R. § 404.1520.  If the claimant successfully meets their burden of proof for Steps One through Four, the Commissioner bears the burden at Step Five to establish that the claimant can perform other work that exists in significant numbers in the national economy.  *See* 20 C.F.R. §§ 404.1505(a), 404.1512(f), 404.1520(a)(4)(v).

medically equaled the severity of one of the listed impairments in 20 C.F.R. part 404, subpart P, appendix 1. (R. 876.)

Before moving to Step Four, the ALJ assessed Plaintiff's RFC. He found that Plaintiff:

> has the [RFC] to perform light work as defined in 20 C.F.R. 416.967(b) except lifting, carrying, pushing, and pulling 10 pounds frequently and 20 pounds occasionally; sitting for approximately six hours and standing/walking for a total of four hours of time on feet in an eight-hour workday; occasional operation of foot controls with the left and right feet; occasionally reaching overhead to the left and right and frequent reaching in all other directions; occasional climbing ramps/stairs; no climbing ladders/rope/scaffolds; occasional balancing (as that term is defined in the Selected Characteristics of Occupations); occasional stooping, kneeling, crouching, and crawling; no work at unprotected heights or around moving mechanical parts; can breathe without restriction but no work requir[ing] direct exposure to concentrated sources of pulmonary irritants; no work in extreme cold or extreme heat; can make simple work-related decisions; in regard to interactions with coworkers, supervisors, and the public, can respond appropriately to supervision, coworkers, and work situations involving occasional but superficial contact with others; superficial contacts are those that involve simply exchanging information or taking direction without complex teamwork or other social interaction requiring a code lower than an "8" on the People Scale of Appendix B to the Dictionary of Occupational Titles, 1991 Revised Edition.

(R. 880.) In determining Plaintiff's RFC, the ALJ stated that he had considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence, as well as the medical opinions and prior administrative medical findings." (*Id.*)

The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms, but he found "[her] statements

17

concerning the intensity, persistence and limiting effects of these symptoms [were] not consistent with the medical evidence and other evidence in the record." (R. 881.)

As to her gastrointestinal conditions, the ALJ cited the following evidence in the medical record concerning Plaintiff's gastritis: (1) Plaintiff was told in September 2021 that past episodes of abdominal pain were gastritis, although it was "currently . . . not occurring"; (2) physical examination showed some tenderness in the periumbilical area, but was otherwise normal; (3) an abdominal CT scan showed only "prominent stool" consistent with constipation; (4) her lab work was normal; (5) her evaluating physician deemed it only "possible" that she was suffering from gastritis/peptic ulcer disease; (6) she was discharged home in "very stable" condition, with prescriptions for omeprazole and Carafate, which improved her pain and nausea; and (7) a follow-up EGD in September 2021 confirmed gastritis. (R. 881–82.)

Regarding diarrhea, the ALJ referenced records submitted prior to his August 2022 unfavorable decision, from September 2021, in which diarrhea was not mentioned in treatment notes. (R. 882.) In more recent treatment notes submitted after his August 2022 decision, the ALJ found "only some scattered subjective complaints of gastrointestinal issues," some of which occurred "on occasion." (*Id.*) He noted that these complaints of gastrointestinal issues were primarily documented in mental health records, rather than in physical treatment records. (*Id.*) However, in some mental health records, Plaintiff denied gastrointestinal symptoms. (*Id.*) In physical treatment records from January 2024, Plaintiff reported a four-day episode of diarrhea, but it had resolved by the time of her presentation for treatment. (*Id.*) The ALJ noted that in subsequent physical treatment records, Plaintiff

18

denied nausea, vomiting, and/or diarrhea. (*Id.*) In addition, he cited a CT scan from November 2023 that was negative for abnormalities, and an abdominal CT scan from January 2025 that revealed only trace, nonspecific fluid in the pelvis, with no bowel obstruction and no acute abnormality. (*Id.*) The ALJ observed that treatment records submitted after his August 2022 unfavorable decision did not document new colonoscopies, endoscopies, esophagoscopies, gastroscopies, or duodenoscopies, and physical examinations of Plaintiff's abdomen were routinely within normal limits. (*Id.*)

As to Plaintiff's BMI, the ALJ referenced records from mid-March 2022, noting that Plaintiff's low BMI was "stable." (*Id.*) He also cited Dr. Krishnamurthi's testimony that Plaintiff's low weight was not linked to any medical impairment, as well as Dr. Amusa's testimony that no evidence in the record showed an effort to treat Plaintiff's weight, and that her low BMI was simply part and parcel of her "body habitus." (*Id.*) He further noted that the medical record contained no mention of fecal incontinence or the need for adult diapers. (R. 883.) The ALJ thus concluded that "substantial physical evidence related to Plaintiff's gastrointestinal issues does not support her allegations regarding the frequency or severity of gastrointestinal issues." (R. 882–83.)

With respect to Plaintiff's migraines, the ALJ factored them into his RFC determination. (R. 884.) He noted that Plaintiff's migraines were long-standing, but were reportedly exacerbated by a 2018 snowmobile accident. (*Id.*) The ALJ cited medical records noting that while Plaintiff experiences auras, her migraines were "without status migrainosus," and were "not intractable." (*Id.*) He observed that treatment has consisted of various medications, some of which have brought "moderate relief." (*Id.*) The ALJ

noted that amitriptyline was discontinued in January 2023, and references to Imitrex/sumatriptan are not found in Plaintiff's records past 2021. (*Id.*) In addition, the ALJ cited Dr. Amusa's September 2024 hearing testimony, in which she testified that Plaintiff no longer takes medications for migraines. (*Id.*) He also noted that the record does not mention migraine treatment with Botox, and that the only emergent treatment Plaintiff received for headaches—a trigger point injection—took place in December 2021. (*Id.*) In more recent treatment notes, the ALJ found that discussions of migraines were largely confined to the "past medical history" section of Plaintiff's records. (*Id.*) The ALJ concluded that the substantial physical evidence failed to support Plaintiff's allegations regarding the purported frequency or severity of migraines. (*Id.*) He further stated, "While I have restricted the claimant [to] light exertional work, there is simply no need [to] include any specific migraine provisions in the above [RFC], including provisions related to noise, screen time, off-task behavior, or absenteeism." (*Id.*)

The ALJ also considered evidence in the record concerning Plaintiff's scoliosis and symptoms of chronic neck and back pain. (R. 883–84.) He noted a February 2019 x-ray that revealed mild straightening of normal cervical lordosis, vertebral bodies of average height and in good alignment, and intact disc spaces. (R. 883.) A July 2020 cervical MRI showed a preserved cervical lordosis, with maintained vertebral body heights. (*Id.*) He noted that records showed Plaintiff's spine was convex right at the thoracolumbar junction, 23 degrees, and on the left thoracic spine, 18 degrees, and "convex of the . . . lumbar and thoracic spine to the right, from which she reported right-sided spasms. (*Id.* at 883–84.) However, the ALJ observed that Plaintiff's cervical scoliosis was characterized as "mild,"

20

with normal disc heights in mid-2020 x-rays. (*Id.*) He noted that at one point, Plaintiff was advised to have surgery for her scoliosis, but there was no indication that she followed through. (R. 884.) The ALJ also referred to records advising Plaintiff to use conservative measures such as physical therapy, trigger point injections, gabapentin, and muscle relaxants. (*Id.*) He cited records in which Plaintiff reported that heat, massage, and trigger point injections had been helpful. (*Id.*) Following an attempted strangulation in December 2021, Plaintiff received an anti-inflammatory for her neck. (*Id.*) The ALJ observed that treatment notes subsequent to his August 2022 unfavorable decision do not contain any spinal imaging or any recent specific treatment for spinal pain. (*Id.*)

The ALJ also considered the record evidence concerning Plaintiff's POTS, asthma, and mental health conditions. (R. 883–86.)

He found that although Plaintiff had described extreme limitations in her daily activities, two factors weighed against the strength of the evidence as supportive of a finding of disability (R. 886.) First, he found that Plaintiff's allegedly limited daily activities could not be verified with any reasonable degree of certainty, and second, even if her daily activities were as limited as alleged, the ALJ found it "difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other factors discussed in this decision." (*Id.*) The ALJ stated that Plaintiff admitted to conducting certain activities that were not as limited as would be expected, given her complaints of disabling symptoms and limitations. (*Id.*) These activities included independently attending to her personal care needs, going out in public alone, driving a car, shopping in stores, preparing simple to

21

complete meals, doing some housework, paying bills, interacting with others in person and remotely, and parenting her young son. (*Id.*) He also noted that Plaintiff held some employment that, while not substantial gainful activity, indicated her daily activities were greater, at times, than she generally reported. (R. 886–87.) The ALJ thus found, "The fact that she remains independent and able to carry out a broad range of activities significantly undercuts her allegations of disability." (R. 887.)

The ALJ also noted that the RFC conclusions reached by physicians employed by the State Disability Determination Services supported a finding of "not disabled." (R. 888.) He cited the opinions of Jeanine Kwun, M.D., and upon reconsideration, Gregory Salmi, M.D., and agreed with their ultimate conclusions that while Plaintiff suffers from some severe physical impairments that necessitate some job-related restrictions, she is not physically disabled from all full-time employment. (*Id.*) The ALJ also cited with approval the opinion of Laverne Barnes, D.O., a Disability Determination Services physician who found that Plaintiff was physically capable of full-time work at a modified light exertional level. (*Id.*) The ALJ found Dr. Barnes' opinion was generally persuasive, explaining that his conclusions were "generally consistent with the substantial physical evidence, including the overall clinical findings and signs, the claimant's courses of and responses to physical treatments, and the claimant's daily and other activities." (*Id.*) The ALJ explained that additional, nonexertional physical restrictions described in his RFC determination were "based upon the combined effects of the claimant's severe physical impairment[s], the claimant's subjective complaints, and the medical evidence received subsequent to Dr. Barnes' review." (*Id.*)

22

In contrast, the ALJ found unpersuasive a boilerplate form submitted by Plaintiff's primary car provider, Dr. Philip Imholte, who had checked off a box indicating that Plaintiff could only work "10–19" hours per week and should engage in "no prolonged standing and climbing" because of "lightheadedness and dizziness." (*Id.*) The ALJ explained that Dr. Imholte provided no explanation, cited no medical evidence, and that the use of the term "prolonged" was vague and lacking in vocational meaning. (*Id.*) He further found that a reduction to only part-time work was "inconsistent with the substantial physical evidence" which showed "mostly routine and outpatient-only physical treatments, and routinely normal clinical signs on exam." (*Id.*)

As to mental impairments, the ALJ found that the conclusions reached by State Disability Determination Specialists also supported a finding of "not disabled." (*Id.*) He cited the findings of: (1) Aroon Suansilppongse, M.D., that Plaintiff was able to carry out simple instructions, even with her mental health conditions and alleged pain/headaches; (2) Mary Sullivan, Ph.D., regarding Plaintiff's ability to concentrate, complete certain tasks, and interact with others; and (3) Maureen Keeshin, Psy.D., that Plaintiff retained adequate cognitive capacity to understand and carry out one-two step simple, routine tasks. (R. 888–89.) He found their opinions were, for the most part, consistent with the substantial mental health evidence, including overall clinical findings, mental status examinations, clinical observations made by providers, Plaintiff's responses to routine, conservative, outpatient-only mental health treatments, and her high level of independence and broad range of activities. (R. 889.)

The ALJ discounted an April 2021 consultative psychological evaluation by Dr. Hardaway, Ph.D., noting that he saw Plaintiff only once, lacked access to all of her medical records, and relied heavily on Plaintiff's subjective report of symptoms and limitations. (R. 889–90.)  Similarly, as to the written statements of Allison O'Hara-Myers, Psy. D., and pre-doctoral intern John White, MA, LMFT, the ALJ found some of their conclusions unpersuasive, while others were somewhat persuasive.  (R. 890.)

Considering all the evidence of record, the ALJ determined at Step Four that Plaintiff had no past relevant work.  (R. 891.)  At Step Five, however, the ALJ determined that Plaintiff could perform jobs within the national economy, working as a final assembler, laboratory tester, or an electronics inspector.  (R. 892.)  Therefore, the ALJ found that Plaintiff was not disabled.  (*Id*.)  The ALJ's decision stands as the final decision of the Commissioner for the purpose of judicial review.  42  U.S.C. §§ 405(g), 1383(c)(3).

## II.     Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to determining whether substantial evidence in the record as a whole supports the decision, 42 U.S.C. § 405(g), or whether the ALJ's decision resulted from an error of law, *Nash v. Comm'r, Soc. Sec. Admin.*, 907 F.3d 1086, 1089 (8th Cir. 2018).  "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)).  The Court must examine "evidence that detracts from the Commissioner's decision as well as evidence that supports it."  *Id*.  (citing *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)).  The Court may not

24

reverse the ALJ's decision simply because substantial evidence would support a different outcome or because the Court would have decided the case differently. *Id.* (citing *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)). In other words, if it is possible to reach two inconsistent positions from the evidence and one of those positions is that of the Commissioner, the Court must affirm the decision. *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992).

It is a claimant's burden to prove disability. *See Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995). To meet the definition of disability for SSI, the claimant must establish that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see* 42 U.S.C. § 1382c(a)(3)(A). As to the durational requirement, the disability, not just the impairment, must have lasted or be expected to last for at least twelve months. *Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

### III.   Discussion

Plaintiff presents three arguments in support of remand or reversal. (Pl.'s Br. at 27–36.) First, she argues that the ALJ failed to identify other severe impairments in the record that, if identified as severe, would have resulted in additional restrictions in the ALJ's RFC determination. (*Id.* at 27–28.) Second, she contends that the RFC does not reflect all of her limitations, specifically, her functional limitations from chronic gastritis and chronic diarrhea, her need for accommodated work, and her absenteeism due to migraines. (*Id.* at 29–34.) Third, she contends that the ALJ failed to address her capacity to complete a

probationary period of employment in reaching his conclusion that Plaintiff could perform work existing in significant numbers in the national economy. (*Id.* at 34–36.) The Court considers these arguments in turn.

### A. Additional Impairments

Again, Plaintiff argues that the ALJ failed to consider other alleged impairments that, if identified as severe, would have resulted in additional restrictions in the RFC. (*Id.* at 28.) The other alleged severe impairments that she identifies, with citations to the record, include chronic neck pain, cervical radiculopathy, and acute trauma injury to the cervical spine (R. 675, 735, 767); chronic thoracic back pain, thoracic myofascial strain, and lumbar back pain (R. 523, 767, 804); and insomnia (R. 747).

To recap, at Step Two of the sequential evaluation process, an ALJ must determine whether the claimant has a severe medical impairment that meets a durational requirement. 20 C.F.R. § 416.920(c). "The sequential analysis can be discontinued at step two 'when an impairment or combination of impairments would have no more than a minimal effect on the claimant's ability to work.'" *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003) (quoting *Simmons v. Massanari*, 264 F.3d 751, 755 (8th Cir. 2001)). The claimant bears the burden of establishing that an impairment is severe. *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). If the ALJ finds that the claimant has a severe medical impairment or combination of impairments that meets the durational requirement, then the analysis proceeds to Step Three.

26

Defendant argues that although the ALJ did not find all of Plaintiff's impairments severe, by concluding that Plaintiff still satisfied Step Two, and proceeding to Step Three, any error at Step Two was rendered harmless. (Def.'s Br. at 8) (citing *Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) ("[A]ny error here [at the second step, by only considering claimant's impairments individually] became harmless when the ALJ reached the proper conclusion that [the claimant] could not be denied benefits conclusively at step two and proceeded to the next step of the evaluation sequence.")).

While the Eighth Circuit has not expressly ruled on whether an error at Step Two, by itself, requires reversal, in *Nicola v. Astrue*, 480 F.3d 885 (8th Cir. 2007), it found that the ALJ's failure to include the plaintiff's diagnosis of borderline intellectual functioning as a severe impairment at Step Two required reversal where there was sufficient medical evidence to support the diagnosis and the ALJ failed to find the condition a severe impairment. While district courts in this circuit have reached different conclusions as to whether *Nicola* requires automatic reversal, *see Lund v. Colvin*, No. 13-cv-113 (JSM), 2014 WL 1153508, at *26–27 (D. Minn. Mar. 21, 2014) (citing cases reaching different conclusions), "[m]ost recent cases . . . have tended to hold the ALJ's failure to list all the severe impairments at Step Two is harmless, so long as the ALJ adequately discusses the effects of those impairments at the subsequent steps." *Rouse v. Berryhill*, No. 4:17 CV 2511 DDN, 2019 WL 1359384, *6 (E.D. Mo. Mar. 26, 2019) (citing *Burgess v. Berryhill*, No. 4:17 CV 2316 ACL, 2018 WL 4457308, at *6 (E.D. Mo. Sept. 17, 2018; *Rentzell v. Berryhill*, No. 4:17 CV 3037, 2018 WL 2050559, at *7 n.2 (D. Neb. May 1, 2018); *Lund*, 2014 WL 1153508, at *27)); *see also McCaskill v. Berryhill*, No. 4:17-CV-4121-KES,

2018 WL 2144553, at *14–15 (D.S.D. Apr. 20, 2018) (recommending reversal for failure to properly identity a severe impairment at Step Two where impairment was diagnosed and properly supported by sufficient medical evidence), *adopting report & recommendation*, 2018 WL 2138659 (D.S.D. May 9, 2018); *Bondurant v. Astrue*, No. 09–328 (ADM/AJB), 2010 WL 889932, at *2 (D. Minn. Mar. 8, 2010) (finding harmless error at Step Two of the analysis if the claimant "makes a threshold showing of any severe impairment [and] the ALJ continues with the sequential analysis process and considers all impairments, both severe and nonsevere."), *aff'd*, 444 F. App'x 928 (8th Cir. 2011); *Emard v. Comm'r Soc. Sec.*, 953 F.3d 844, 852 (6th Cir. 2020) (finding harmless error where ALJ found condition not severe but considered nonsevere impairments at later steps).  In light of this authority, the Court finds that the ALJ's failure to find Plaintiff's other alleged impairments as severe at Step Two, alone, does not warrant reversal.  The Court proceeds to address whether the ALJ adequately addressed the effect of such impairments at subsequent steps.

As to the additional impairments that Plaintiff identifies here as a basis for reversal or remand, the ALJ expressly or implicitly considered them.  (R. 875 (referencing strangulation incident, snowmobile accident, neck pain, discomfort, and stiffness), R. 883 (discussing chronic neck and back pain, cervical spine x-ray), R. 884 (noting right-sided spasms to thoracic spine, strangulation in 2021), R. 885 (insomnia).)  He explained that while he considered Plaintiff's neck pain in conjunction with her scoliosis and migraines, there was "no indication of a durationally severe impairment stemming from the December 2021 strangulation incident, (R. 875), and that treatment notes submitted after his August

28

2022 decision "do not contain any spinal imaging or any recent specific treatment for spinal pain." (R. 884.)

As to insomnia, Plaintiff cites one page in the record in support of her argument that this impairment should have resulted in additional restrictions in her RFC. (Pl.'s Br. at 28) (citing R. 747). That medical record notes Plaintiff's "inability to eat or sleep since earlier this week she had stabbed her ex-boyfriend in the chest approximately 7 times," which, she reported, was in self-defense. (R. 747.) In that context, Plaintiff was diagnosed with acute reaction to stress and "insomnia, unspecified type." (*Id.*) She was provided with a "low-dose prescription to help her sleep." (*Id.*) The ALJ expressly noted insomnia among Plaintiff's mental health symptoms, and that her mental health diagnoses, including PTSD, necessitated the mental parameters contained in the RFC. (R. 885.) There is no evidence in the record showing that insomnia caused Plaintiff functional limitations that were not addressed by the ALJ.

In addition, the ALJ broadly considered Plaintiff's nonsevere impairments. (R. 874 ("There are also other impairments alleged and/or referenced in the record, which are either nonsevere (as they have had no more than a minimal impact on the claimant's work functioning and/or did not meet the 12-month durational requirement) or medically non-determinable (as there are no verifiable objective clinical findings, signs, and/or diagnoses made by an 'acceptable medical source.'")); R. 880 ("In making this [RFC] finding, I have considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.").)

29

In sum, the Court concludes that the ALJ considered all of Plaintiff's impairments in determining her RFC.  Plaintiff does not identify any additional limitations that she believes these impairments warranted.  Accordingly, the Court finds that the ALJ did not commit reversible error at Step Two by not finding certain conditions severe.

### B.  Whether Substantial Evidence Supports the RFC

Plaintiff also contends that the ALJ erred at Step Three of his sequential evaluation because the RFC did not reflect all of Plaintiff's limitations.  (Pl.'s Br. at 28–34.) Specifically, she argues that the RFC failed to reflect the resulting limitations from her chronic gastritis and chronic diarrhea, her need for accommodated work, and her absenteeism due to her migraine disorder.  (*Id.*)

While the RFC assessment is reserved for the ALJ, 20 C.F.R. § 416.920b(c)(3)(vi), "[i]t is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC."  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001).

Again, Plaintiff asserts that the limitations the ALJ failed to include in the RFC relate to frequent, unexpected bathroom breaks (R. 29–30), the need for accommodated work (R. 31–33), and absenteeism due to migraine disorder.  (R. 33–34.)  She contends that she takes two to three bathroom breaks in a shift, that her current employer accommodates absences of up to half of her scheduled shifts, and that her migraines require frequent absences.  (R. 29–34.)

The bathroom breaks and absences due to migraines relate to time off-task or off-work and the possible need for accommodations.  However, as Defendant observes (Def.'s Br. at 10), the issue is not whether Plaintiff actually takes additional bathroom breaks or

misses scheduled shifts, but rather whether her impairment requires her to take extra breaks or miss work. *See* 42 U.S.C. § 1382c(a)(3)(A) (defining disability as inability to engage in substantial gainful activity due to a medically determinable impairment); *see also* 20 C.F.R. § 416.966(c)(1)–(8) (stating that a claimant is not disabled if her RFC and vocational abilities make it possible to perform work, even if the claimant remains unemployed due to: (1) her inability to get work; (2) the lack of work in her local area; (3) the hiring practices of employers; (4) technological changes in the industry in which the claimant has worked; (5) cyclical economic conditions; (6) no job openings; (7) the claimant would not actually be hired to do work she could otherwise do; or (8) the claimant does not wish to do a particular type of work). Here, substantial evidence in the record supports the ALJ's finding that Plaintiff's impairments do not require off-task time or absenteeism, nor does the RFC require limitations in this regard.

Certainly, the ALJ was aware of Plaintiff's testimony in which she described being off-task and missing work shifts, as the ALJ referenced it in his decision. (R. 881.) However, he concluded that the record evidence did not fully support Plaintiff's allegations. *See Casey v. Astrue*, 503 F.3d 687, 696 (8th Cir. 2007) (finding ALJ did not err in finding claimant's statements about intensity and severity of her symptoms not fully credible because the ALJ pointed to substantial evidence in the record to support decision). Specifically, the ALJ discussed Dr. Amusa's testimony, noting her access to Plaintiff's complete medical records, and found her testimony "persuasive insofar [as] the claimant would *not* require time off-task or absenteeism provisions for gastrointestinal issues or migraine headaches." (R. 887) (emphasis in original).

31

While the ALJ found that objective medical evidence of gastritis, chronic diarrhea, and low BMI warranted exertional restrictions to the light exertion level, he did not find that the medical records supported "the inclusion of any related time off provisions."  (R. 881, 883.)  He cited medical records showing an "unremarkable" abdominal ultrasound, an abdominal CT scan that showed only "prominent stool" that was consistent with constipation, mild ductal prominence, a negative colonoscopy, negative stool studies, notes suggesting that diarrhea was attributable to consumption of red meat, but no treatment with an allergist, and, in more recent treatment notes submitted after the August 2022 unfavorable decision, only scattered subjective complaints of gastrointestinal issues, another abdominal CT scan from November 2023 that did not show abnormalities, a 2025 abdominal CT scan that showed only trace, nonspecific fluid in the pelvis, and physical examinations of Plaintiff's abdomen that were routinely within normal limits.  (R. 882.)  Although Plaintiff reported a four-day bout of diarrhea in January 2024, the ALJ noted that by the time of her presentation, it had resolved.  (*Id.*)

The ALJ also observed that Plaintiff's conditions improved with treatments, including prescription medication and the avoidance of red meat, and that she was no longer taking medications for gastrointestinal issues.  (*Id.*)

As to Plaintiff's migraines, the ALJ identified evidence that did not support limitations for off-task or off-work limitations.  (R. 884.)  He noted medical records describing her migraines as "without status migrainosus" and "not intractable."  (*Id.*)  The ALJ further noted that more recent medical records had documented migraine headaches in the "past medical history" section.  (*Id.*)

Again, even if this court would reach a different conclusion, or if substantial evidence supports a contrary outcome, the Court does not reverse the Commissioner's conclusions as long as they are supported by substantial evidence on the record as a whole. *Nash*, 907 F.3d at 1089. The Court finds that Plaintiff has failed to meet the burden of proving that her impairments required off-task or off-work limitations or accommodations. *See Swink v. Saul*, 931 F.3d 765, 770 & n.3 (8th Cir. 2019) (finding RFC assessment excluding absenteeism was supported by substantial evidence, including objective medical evidence, treatment notes, and opinion evidence showing that claimant's impairments would not cause frequent absences).

### C. Ability to Complete a Probationary Period

Finally, Plaintiff argues that the ALJ erred in failing to address her ability to complete a probationary period, and therefore, his Step Five conclusion is in error. (Pl.'s Br. at 34–36) (citing *Sczepanski v. Saul*, 946 F.3d 152, 158–59 (2d. Cir. 2020) (remanding matter to Commissioner to develop record where ALJ assumed Plaintiff's ability to complete a probationary period was irrelevant to her disability status). Plaintiff contends that if a claimant could not successfully complete a probationary period of employment, the claimant would be precluded from performing the jobs identified by the Vocational Expert. (*Id.*)

In response to Plaintiff's counsel's questioning at the February 28, 2025 hearing, Vocational Expert Yi testified about an employer's tolerance for absenteeism during a probationary employment period, as well as an employer's tolerance for a request for written instructions beyond a probationary period. (R. 946–49.) Mr. Yi's testimony

33

implicated Plaintiff's physical and mental health issues—including migraines, chronic diarrhea, depression, and intellectual aptitude.

Unlike *Sczepanski*, where the ALJ found probationary periods were irrelevant to a disability determination because they "relate to an employer's hiring practices," 946 F.3d at 158, the ALJ here did not discount the relevance of limitations during a probationary period as a general matter. Indeed, "[a] condition that does not allow a person to work on a regular basis precludes substantial gainful activity." *Dix v. Sullivan*, 900 F.2d 135, 138 (8th Cir. 1990). Here, however, the ALJ found that any off-task and absenteeism limitations were not supported by the record, which implicitly includes a probationary period.

The ALJ carefully considered Plaintiff's ability to understand, remember, or apply information, pointing to testing conducted in connection with a March 2024 neuropsychological evaluation that showed Plaintiff's intellectual ability was in the "low average" range. (R. 877.) He noted that mental status examinations and clinical observations of Plaintiff were routinely within normal limits and did not show any problems with short-term or long-term memory or with immediate or delayed recall. (R. 877–78, 885–86.) The ALJ also noted Plaintiff's ability to carry out activities of daily living that require understanding, remembering, and applying information, such as navigating a motor vehicle, shopping in stores, preparing meals, caring for her son, and paying her bills. (R. 878, 886.) "Performing these activities without significant disruption discredits [Plaintiff's] subjective complaints of disabling pain and supports the ALJ's decision." *Austin v. Kijakazi*, 52 F.4th 723, 731 (8th Cir. 2022). Ultimately, the Vocational

34

Expert's testimony that an employer would not tolerate a request for written instructions beyond an initial 30-day probationary period does not undermine the ALJ's conclusion, as substantial evidence in the record supports his finding that such additional supports were unnecessary.

Likewise, as the Court has noted, the ALJ cited record evidence in finding that Plaintiff's chronic gastritis and diarrhea, BMI, POTS, scoliosis, and migraines did not preclude her from finding jobs in the national economy that she could perform. (R. 881–91.) Granted, there is evidence in the record that supports Plaintiff's position, such as Plaintiff's own testimony and Mr. Yi's responses to the questions posed by Plaintiff's counsel. But "[i]f substantial evidence supports the Commissioner's conclusions, this court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome." *Nash*, 907 F.3d at 1089–90. Here, the ALJ did not dismiss the relevance of a probationary period to a finding of disability. Rather, based on all of the record evidence, he did not find any limitations that would interfere with Plaintiff's ability to perform specific jobs in the national economy. Accordingly, the Court declines to reverse or remand this matter based on Plaintiff's probationary-period argument.

## IV. Order

Based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT**:

35

1. The relief sought in Plaintiff's Brief [Doc. No. 10], seeking remand or reversal of the Commissioner's decision to deny her Social Security disability benefits, is **DENIED**;

2. The relief sought in Defendant Commissioner of Social Security Administration Frank Bisignano's Brief in Opposition [Doc. No. 18], requesting that the Court affirm the Commissioner's decision, is **GRANTED**; and

3. Plaintiff's Complaint [Doc. No. 1] is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**

Date:  July 31, 2026                     s/Susan Richard Nelson
                                         SUSAN RICHARD NELSON
                                         United States District Judge

36